IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LUIS ALBERTO PADILLA, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 14-007 (JBS) |
| COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | |

APPEARANCES:

Alan H. Polonsky, Esq.
512 S. White Horse Pike
Audubon, N.J. 08106
     Attorney for Plaintiff

Paul J. Fishman
UNITED STATES ATTORNEY
     By: M. Jared Litman
          Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
P.O. Box 4177
Philadelphia, P.A. 19101
     Attorney for Defendant

**SIMANDLE, Chief Judge:**

## Contents

I.   INTRODUCTION ............................................. 2

II.  BACKGROUND ............................................... 5

 A.   Factual and Procedural History ......................... 5

 B.   ALJ's Decision ......................................... 12

III. STANDARD OF REVIEW ....................................... 15

IV.  DISCUSSION ............................................... 16

1.   The ALJ Did Not Err in Finding Intellectual Disability
Plaintiff's Sole Severe Impairment ....................... 18

2.   The ALJ Did Not Err in Finding that Plaintiff's Condition
Did Not Meet or Equal Listing 12.05C ..................... 25

3.   The ALJ Properly Relied Upon the Medical-Vocational
Guidelines and SSR 85-15 in Finding Plaintiff Able to Perform
"Other Work" ............................................. 31

V.   CONCLUSION ............................................. 41

**I.   INTRODUCTION**

In this action, Plaintiff Luis A. Padilla (hereinafter, "Plaintiff"), an approximately forty year old male with no history of medical or psychiatric treatment, seeks review pursuant to 42 U.S.C. § 405(g) of the Commissioner of the Social Security Administration's (hereinafter, "Defendant") denial of his application for disability benefits pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1381-1385.

On September 11, 2012, the Administrative Law Judge (hereinafter, the "ALJ") issued a fourteen page written decision denying Plaintiff, who purports to suffer from a learning disability, mental challenges, sleep apnea, and obesity, Social Security benefits for the period beginning May 3, 2009, the alleged onset date of disability to September 11, 2012. (See R. at 15-28.) Critically, although the ALJ found that Plaintiff

suffered from a severe intellectual disability,[1] the ALJ found Plaintiff able to meet the basic mental demands of unskilled work at all exertional levels, and therefore concluded that Plaintiff could obtain other work existing in significant numbers in the national economy. (See id.)

In the pending appeal, Plaintiff insists that the ALJ's decision must be reversed on three grounds.  First, Plaintiff argues that the ALJ committed reversible error at step two of the five-step sequential analysis, by finding that Plaintiff's intellectual disability constituted his sole severe impairment, without appropriately considering Plaintiff's obesity and emotional limitations. (Pl.'s Br. at 12-14.)  Second, Plaintiff argues that the ALJ improperly evaluated Plaintiff's limitations at step three, by concluding that Plaintiff's intellectual impairment did not meet or medically equal one of the listed

---

[1] The record in this action repeatedly refers to Plaintiff's "mental retardation."  (See, e.g., Def.'s Br. at 8; R. at 15, 17, 21, 27, 49.) However, on August 1, 2013, the Social Security Administration replaced the term "mental retardation" with "intellectual disability" in their Listing of Impairments, in order to reflect the widespread adoption of the term "intellectual disability" by Congress, government agencies, and various public and private organizations. See Bethea v. Comm'r of Soc. Sec., No. 13-3961, 2014 WL 4798815, at *5 n.4 (D.N.J. Sept. 26, 2014). Despite the modification in terminology, the Listing itself remains substantively identical. See Hampton v. Colvin, No. 14-543, 2015 WL 222346, at *3 n.2 (W.D. Pa. Jan. 14, 2015) (noting that the "substance of the Listing did not change") (citation omitted).  Therefore, the Court will conform its reference to Plaintiff's impairment to the modern convention.

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1
(hereinafter, the "Listing of Impairments"), without adequately
discussing Plaintiff's alleged limitation to only occasional
social contact. (Id. at 14-15; Pl.'s Reply at 3-4.)  Finally,
Plaintiff argues that the ALJ's reliance upon the Medical-
Vocational Guidelines and Social Security Ruling (hereinafter,
"SSR") 85-15 without vocational testimony at step five,
contravenes the procedural requirements of Sykes v. Apfel, 228
F.3d 259 (3d Cir. 2000) and the related administrative
acquiescence ruling, Social Security Ruling AR 01-1(3). (Pl.'s
Br. at 15-19.)

The principal issues before the Court are whether
substantial evidence supports the ALJ's conclusion at step two
that "limited intellectual capacity" constituted Plaintiff's
only severe impairment; whether the ALJ adequately considered
Plaintiff's alleged "other impairments" in connection with the
Listing of Impairments at step three; and whether the ALJ
appropriately relied upon the Medical-Vocational Guidelines in
finding at step five, without the benefit of vocational expert
testimony, that Plaintiff could perform "other work."

For the reasons explained below, the Court finds that
substantial evidence supports the ALJ's determinations, and will
affirm the ALJ's decision.

II.  **BACKGROUND**

    A. **Factual and Procedural History**[2]

    Plaintiff filed an application for disability insurance benefits and supplemental security income on January 6, 2011.[3] (See R. at 149-161.)

    In connection with the Social Security Administration's (hereinafter, the "SSA") review of Plaintiff's initial application, the New Jersey Division of Disability Services conducted a face-to-face interview of Plaintiff on January 21, 2011. (See R. at 185-194.) During the interview, Plaintiff indicated that his previous employer, Pep Boys Auto Parts Store (hereinafter, "Pep Boys"), laid him off "due to [his] disability." (R. at 190.) The examiner, however, noted that Plaintiff "did not exhibit any obvious physical impairment" and "appeared highly functional." (R. at 187.) Indeed, Plaintiff

_____

[2] The record in this action contains no medical history that predates Plaintiff's disputed application for Social Security benefits. Indeed, Plaintiff conceded on various occasions throughout the administrative process that he had never seen a physician or any other health care professional for any physical and/or medical condition. (See, e.g., R. at 193, 223, 236.) Therefore, the Court will discuss the factual predicate and procedural circumstances of this litigation in unison.
[3] Plaintiff previously received Supplemental security income and disability insurance benefits based upon impairments of intellectual incapacity and a learning disorder.  (See R. at 15, 32-33.)  The Social Security Administration, however, terminated Plaintiff's benefits in 2005, because his earnings purportedly exceeded the regulatory maximum for Social Security benefits (i.e., his employment qualified as substantial gainful activity). (R. at 33.)  As noted by the ALJ (R. at 15), these procedural circumstances do not impact the pending appeal.

specifically stated that his conditions had not required any medical treatment, and asserted that he had "not been to any doctors other than for a cold." (R. at 194.)

Following the interview, the claims adjudicator requested additional evidence concerning the manner in which Plaintiff's alleged conditions limited his daily activities. (R. at 197-216.)  In connection with this functional audit, Plaintiff identified a lengthy twelve-year history of employment in "Customer Service" jobs—all of which required lifting at various weights, and prolonged periods of standing and/or walking. (R. at 207-15.) Plaintiff, however, stated that his alleged disability affected his ability to concentrate, complete tasks, and follow instructions. (R. at 202.)  Nevertheless, Plaintiff indicated that such condition caused no impact to his ability to lift, walk, sit, climb stairs, understand, communicate, and/or to get along with others. (R. at 201-02.)  Nor did such condition affect Plaintiff's ability to engage in an array of household chores (including mowing the lawn) and social activities (including bowling, going to movies with friends, and playing video games). (R. at 200-01.)

Thereafter, Dr. Wm. Dennis Coffey, a consultative examiner with South Jersey Psychology, conducted an intellectual evaluation of Plaintiff on February 21, 2011, in order to assess his level of functioning. (R. at 248-53.)  At that time, Dr.

6

Coffey observed that Plaintiff's height of 5'8" and weight of 255 pounds placed his body mass index in the obese range. (R. at 249.)  Nevertheless, Plaintiff presented with a "normal" gait, no "oddities" in posture, and participated in the examination without difficulty. (Id.) In addition, Plaintiff represented that, although he spends a typical day at home,[4] he "usually run[s] around the block with a bike, work[s] out, [] job search[es]," attends church every Sunday, sees friends multiple times a month, and goes to the casino twice a year. (Id.)

With respect to the intellectual assessment, Dr. Coffey's testing revealed that Plaintiff's full scale IQ of 63 placed him in the "Mildly Deficient range of intellectual functioning." (R. at 250.)  However, he maintained normal speech quality and stream of conversation throughout the course of the examination, and otherwise exhibited "no evidence of a thought disorder." (Id.) Dr. Coffey therefore concluded that Plaintiff possessed an "adequate understanding and memory," but limited mental pace and concentration. (R. at 250.)  Dr. Coffey, accordingly, found Plaintiff's condition "to be 100% mental." (Id.)

In so concluding, Dr. Coffey noted that the results of Plaintiff's intellectual and interpersonal assessment "do not support" the "normal level of functioning" suggested by

---

[4] As a result, Dr. Coffey found that Plaintiff had limited social interactions. (R. at 250.)

Plaintiff's job history. (Id.) Rather, Dr. Coffey found Plaintiff "likely to require regular supervision" in a role "limited to simple, rote labor."[5] (Id.) However, Dr. Coffey found Plaintiff "able to maintain regular employment," provided that he received the necessary supervision and limitations in required tasks, namely, that the work be sufficiently simple. (Id.) As a result, Dr. Coffey indicated that Plaintiff "may benefit from a referral to the Division of Vocational Rehabilitation Services." (R. at 251.)

In light of Dr. Coffey's findings, the state agency psychological consultant concluded that, despite Plaintiff's mild intellectual capacity, Plaintiff's prior work history suggested a higher functional capacity, particularly given his professed ability "to prepare simple meals, clean house, drive, manage his finances ... socialize with friends, and shop." (R. at 57.) The psychological consultant therefore found Plaintiff able to perform basic unskilled jobs, particularly if such jobs consisted primarily of "simple, repetitive tasks." (R. at 53, 55, 58.) Consequently, because Plaintiff's mental limitations did not preclude him from obtaining some work (even if not work in his past relevant field), the SSA found Plaintiff "not

---

[5] For the same reason, Dr. Coffey recommended that a beneficiary be appointed to manage any benefits ultimately assigned to Plaintiff. (R. at 251.)

disabled," and denied his application for Social Security disability benefits on March 11, 2011. (R. at 58.)

Plaintiff requested reconsideration of the SSA's initial determination on May 13, 2011. (R. at 77.)  In so requesting, however, Plaintiff did not report any change in his physical and/or mental limitations, nor provide any additional medical evidence. (R. at 60-61.) Rather, Plaintiff merely relied upon the same information submitted in connection with his initial application. (Id.)  Given the absence of any new allegations, in addition to the functional abilities reflected by Plaintiff's work history, the SSA found the initial determination that the "evidence suggest[ed] a higher level of functioning than" indicated by Plaintiff's IQ scores, "consistent with the overall evidence," and denied Plaintiff's request for reconsideration. (R. at 61, 105-06 (finding the original determining denying Plaintiff's claim for disability benefits "proper under the law").) On August 17, 2011, Plaintiff requested a de novo hearing before an ALJ, on the basis that Plaintiff's mental limitations render him unable to perform substantial gainful employment, but again stated that he had "no additional evidence to submit."  (R. at 102-10.)  The SSA scheduled the hearing for August 7, 2012. (R. at 126.)

In advance of the hearing, Nancy Mari Purcell, Ed.D, a learning disability teacher/consultant, conducted an educational

evaluation on November 28, 2011, at the referral of the Division of Vocational Rehabilitation. (R. at 254-61.) With respect to Plaintiff's demeanor during testing, Dr. Purcell observed that Plaintiff spoke in "clear sentences, maintained consistent eye contact, [and] demonstrated fair concentration," despite his limited academic abilities. (R. at 254-55.) Throughout the tasks, however, Plaintiff "required constant praising and encouragement [in order] to continue on challenging items." (R. at 255.)

With regard to the intellectual assessment, Dr. Purcell's assessments revealed results consistent with those reported by Dr. Coffey. (See R. at 255-57.) Plaintiff's test scores specifically depicted reading comprehension, mathematical reasoning, and written skills at levels between 1st and 3rd grade, all of which collectively confirmed Plaintiff's limited cognitive abilities. (See id.)  Indeed, Dr. Purcell found that Plaintiff's "extremely limited" academic skills would "require a more intensive individual vocational setting." (R. at 258.) Moreover, Dr. Purcell indicated that such a vocational setting must include "rote activities" taught through "extensive repetitions and opportunities to review materials," and with "frequent positive reinforcements." (R. at 259.)  Dr. Purcell therefore stated that any

10

> [V]ocational placement must consider his level of
> academic functioning to be that of what one could
> reasonably expect a fifth or sixth grader to
> accomplish. All information must be presented in small
> manageable portions and with many repetitions in order
> for [Plaintiff] to master the task. New tasks or
> information should be introduced slowly and constant
> review of past tasks is necessary for retention.

(R. at 261.) Nevertheless, Dr. Purcell noted that Plaintiff

"desire[d] to improve" and concluded that such improvement

"could be achieved in a highly structure vocational training

environment." (R. at 259.) Plaintiff thereafter proceeded to an

administrative hearing before an ALJ, at which time Plaintiff

appeared, with counsel, and testified before an ALJ.  (R. at

15.)

Following the hearing, the ALJ issued a written decision on

September 11, 2012, finding Plaintiff "not under a 'disability,'

as defined in the Social Security Act," and therefore ineligible

for Social Security benefits. (See R. at 12-28.) Plaintiff filed

a formal request for review of the ALJ's decision on November 6,

2012 (see R. at 10), and submitted additional legal argument

concerning Plaintiff's alleged entitlement to Social Security

benefits. (See R. at 244-47.)  The Appeals Council, however,

found "no reason" to review the ALJ's decision and, accordingly,

denied Plaintiff's request for review on November 6, 2013,

thereby rendering the ALJ's decision the final administration

decision in this action.  (R. at 1-3.)  Plaintiff timely filed

this action, which Defendant opposes.  The Court has
jurisdiction to review the Defendant's final decision pursuant
to 42 U.S.C. § 405(g).

### B. ALJ's Decision

In a written opinion dated September 11, 2012, the ALJ
discussed, at length, Plaintiff's representations concerning his
functional abilities and work history, in addition to the
various consultative examiners' findings and observations, and
the testimony adduced during the hearing. (See, e.g., R. at 19-
24.) The ALJ concluded that Plaintiff had not engaged in
substantial gainful activity since May 3, 2009, the date on
which Plaintiff filed his initial application for Social
Security benefits. (R. at 16.)  The ALJ further determined that
Plaintiff suffered from the severe impairment of intellectual
disability. (R. at 17.)  In so finding, however, the ALJ
concluded that Plaintiff failed to meet his burden of
demonstrating any additional severe impairment, including
obesity, but noted that such a condition may nevertheless affect
the ALJ's analysis at later stages of the sequential analysis.
(Id.)

Notwithstanding Plaintiff's "severe" impairment, the ALJ
found that Plaintiff's intellectual disability did not meet or
equal in severity, any impairment found in the Listing of
Impairments, including Listing section 12.05 ("Intellectual

12

Disability"), which "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." (Id.)

In addressing Plaintiff's residual functional capacity, the ALJ evaluated, among other factors, Plaintiff's testimony and other statements regarding his ability to engage in daily activities, his assertions concerning restrictions and/or limitations on his abilities, and the medical opinions rendered by the various consultative examiners. (Id.)  The ALJ found the record evidence indicated that Plaintiff suffered from an impairment "not as debilitating as suggested" by Plaintiff. (Id.)  In particular, the ALJ found Plaintiff's professed limitations inconsistent with his lengthy employment history, his depiction of a typical day, and his ability to participate in the various evaluative assessments with relative ease. (R. at 20-21.) In that regard, the ALJ found credible the uniform conclusions of the state agency psychological consultant and Dr. Coffey that Plaintiff possessed "adequate ability for simple, rote labor and [that Plaintiff's] mental capacity appear[ed] adequate for simple work." (R. at 22.)

Moreover, the ALJ noted that "the record contain[ed] several inconsistencies that adversely affect[ed]" Plaintiff's credibility. (R. at 24.) Critically, the ALJ found Plaintiff's statement that Pep Boys terminated his employment as a result of

13

his disability in contradiction to Plaintiff's statement to Dr. Coffey that Pep Boys let him "go because they were cutting back people and that he collected unemployment and was job searching." (Id. (citation omitted).) In addition, the ALJ took note of the fact that Plaintiff "appeared highly functional" throughout the various examinations, and found that Plaintiff's "long and fairly consistent work history" demonstrated an "ability to perform substantive gainful activity, despite his mental limitations." (Id.) For all of these reasons, the ALJ found Plaintiff's "reported restrictions" inconsistent "with the preponderance of the medical evidence," and other record evidence. (R. at 25.) The ALJ therefore determined that Plaintiff possessed the residual functional capacity to perform "work activities of all exertional levels," but that his nonexertional limitations required that such activities be limited to "simple, repetitive tasks and simple instructions with occasional social contacts." (R. at 20.)

Nevertheless, the ALJ concluded that the "detailed tasks" required by Plaintiff's past relevant work "as a automotive parts customer service person/stocker" exceeded Plaintiff's residual functional capacity. (R. at 26.) The ALJ accordingly found Plaintiff unable to perform any past relevant work, but concluded that Plaintiff's ability "to understand, carry out or remember simple instructions, [and] respond appropriately to

14

peers or authorities" demonstrated his ability "to meet the basic mental demands of work" and to "function within a routine work-like setting." (R. at 27.)  In so concluding, the ALJ relied upon the Medical-Vocational Guidelines and SSR 85-15, and ultimately concluded that Plaintiff possessed the ability to "make an adjustment" to work existing in "significant numbers in the national economy," despite his nonexertional (i.e., mental) limitations. (R. at 27-28.)

## III. STANDARD OF REVIEW

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008).  The requirement of substantial evidence, however, constitutes a deferential standard of review, see Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004), and does not require "a large or [even] considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988).  Rather, substantial evidence requires "more than a mere scintilla[,]" Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), but generally less than a preponderance.  See Jones, 364 F.3d at 503.  Consequently, substantial evidence supports the Commissioner's determination where a "reasonable mind might accept the relevant evidence as adequate" to support the conclusion reached by the Commissioner. Monsour Med. Ctr. v.

15

Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

In order to facilitate the Court's review, the ALJ must set out a specific factual basis for each finding. Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975). Additionally, the ALJ "must adequately explain in the record [the] reasons for rejecting or discrediting competent evidence," Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)), and must review all pertinent medical and nonmedical evidence "and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000). However, the ALJ need not discuss "every tidbit of evidence included in the record." Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004). Rather, the ALJ must set forth sufficient findings to satisfy the reviewing court that the ALJ arrived at a decision through application of the proper legal standards, and upon a complete review of the relevant factual record. See Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983).

**IV.  DISCUSSION**

**A. Legal Standard for Determination of Disability**

The SSA reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the SSA determines whether the claimant currently

engages in "substantial gainful activity." 20 C.F.R. § 1520(b). In step two, the claimant must demonstrate that the claimant suffers from a "severe impairment."  20 C.F.R. § 1520(c). Impairments lacking sufficient severity render the claimant ineligible for disability benefits.  See Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  Step three requires the Commissioner to compare medical evidence of the claimant's impairment to the list of impairments presumptively severe enough to preclude any gainful activity.  20 C.F.R. § 1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Plummer, 186 F.3d at 428. Step four requires the ALJ to consider whether the claimant retains the ability to perform past relevant work. 20 C.F.R. § 1520(e). If the claimant's impairments render the claimant unable to return to the claimant's prior occupation, the ALJ will consider whether the claimant possesses the capability to perform other work existing in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 1520(g); 20 C.F.R. 404.1560(c).

Here, Plaintiff challenges the ALJ's determinations at steps two, three, and five, and the Court will address each in turn.

### 1. The ALJ Did Not Err in Finding Intellectual Disability Plaintiff's Sole Severe Impairment

At step two, the ALJ concluded, upon review of the record evidence, that Plaintiff failed to demonstrate that he suffers from any severe impairment other than an intellectual disability. (R. at 17.) Plaintiff, however, insists that the ALJ erred in this determination, by failing to adequately discuss Plaintiff's obesity and emotional limitations. (See Pl.'s Br. at 12-14.) Defendant, by contrast, argues Plaintiff's intellectual functioning "has always" formed the fabric of his claim for Social Security benefits, not his obesity, and further disputes the substantiality of any other alleged impairments. (Def.'s Opp'n at 9-11.) For the reasons that follow, the Court finds that substantial evidence supports the ALJ's step two determination.

As stated above, step two requires the ALJ to determine whether the plaintiff's claimed impairment and/or combination of impairments possesses the requisite severity. See 20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment, in turn, has been defined as any impairment that significantly limits an individual's "physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c), including "seeing, hearing, and speaking," and "understanding, carrying out, and remembering simple instructions." 20 C.F.R. §§

18

404.1520(c), 404.1521(b); see also SSR 85–28, 1985 WL 56856, at
*3 (Jan. 1, 1985).  An impairment is not severe, however, where
the record demonstrates merely a "slight abnormality or a
combination of slight abnormalities" that has, individually or
in the aggregate, "'no more than a minimal effect on an
individual's ability to work.'" Magwood v. Comm'r of Soc. Sec.,
417 F. App'x 130, 132 (3d Cir. 2008) (quoting Newell v. Comm'r
of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003)).

    In evaluating severity, the ALJ must consider the available
medical evidence, "in order to assess the effects of the
impairment(s) on [the individual's] ability to do basic work
activities." SSR 85–28, 1985 WL 56856, at *4. However, because
the plaintiff bears a minimal burden on the issue of severity,
the Court of Appeals has directed that "[r]easonable doubts on
severity" be "resolved in favor of the claimant," Newell, 347
F.3d at 546, and that a denial of benefits on the ground of non-
severity "be reviewed with close scrutiny." McCrea v. Comm'r of
Soc. Sec., 370 F.3d 357, 359 (3d Cir. 2004).

    Here, the ALJ did not deny Plaintiff Social Security
benefits on the ground of non-severity. (R. at 17.) Rather, the
ALJ found that the record lacked sufficient evidence to conclude
that Plaintiff's obesity significantly impacted Plaintiff's
ability to perform basic work activities. (Id.) The Court finds,

19

as stated below, that substantial record evidence supports the ALJ's determination in this respect.

Critically, Plaintiff never claimed obesity as an impairment in connection with his application (see R. at 59-76), nor did he articulate any weight-based limitations during the various evaluative assessments or at the administrative hearing. (See R. at 29-47.) To the contrary, throughout the entirety of the administrative process, Plaintiff only alleged the following impairments: a learning disability, developmental delays, mental challenges, and sleep apnea. (See, e.g., R. at 51, 68, 102, 190, 218.) Plaintiff, accordingly, indicated that his conditions affected his ability to concentrate, complete tasks, and to follow instructions, but specifically denied any impact on his ability to lift, squat, walk, or engage in substantial activity on a regular basis during an eight-hour, five-day work week or equivalent schedule (R. at 201-202), considerations the ALJ noted would typically be associated with obesity.[6] (R. at 17.)

Moreover, despite his weight, Plaintiff repeatedly described his ability to engage in an array of household and personal tasks, without any physical limitations.[7] (R. at 199-

---

[6] To the contrary, Plaintiff described, as stated below, an unimpeded ability to undertake full-time employment. (R. at 209-15.)

[7] For that reason, among others, the ALJ found the record "silent" as to any severe physical and/or exertional limitations, particularly given Plaintiff's professed physical

200, 248-49.)  Indeed, Plaintiff professed an ability to take walks, exercise, ride a bike, vacuum, and mow the lawn, all without issue other than the fact that Plaintiff occasionally "los[t] track" of his task, and had to be reminded to finish. (R. at 199-200, 248-49.)  In addition, Plaintiff listed a lengthy, full-time employment history that required him to perform a number of physical tasks, and to remain walking and/or standing for the majority of his 8-hour workday. (See R. at 207-15.)  Indeed, Plaintiff stated that his past employment at Pep Boys required him, on a daily basis, to "move parts, tires, batter[ies]," to "unload trucks," and to lift items that weighed up to 50 pounds. (R. at 209.)

    In light of Plaintiff's own statements, and the absence of any evidence to suggest any physical limitations, Dr. Coffey, Dr. Padilla, and the state agency psychological consultant all consistently concluded that Plaintiff suffered from cognitive, rather than weight-based, issues.[8] (See, e.g., R. at 250, 260-

---

abilities.  (R. at 19-20.)  This conclusion finds substantial support in the record.
[8] The Court rejects Plaintiff's assertion that the state agency psychological consultant necessarily concluded that Plaintiff's "obesity precluded [him] from work[ing] beyond a light level of exertion." (Pl.'s Br. at 12-13.) Notably, although the state agency psychological consulted concluded that "the seven strength factors" (i.e., lifting/carrying, standing, walking, sitting, pushing, and pulling) demonstrated that Plaintiff possessed a capability to perform, at most, "light" work, Defendant correctly notes that the state consultant does not reference Plaintiff's obesity, nor provide any explanation for

61.)   Indeed, Dr. Coffey unequivocally stated that Plaintiff's condition appeared "to be 100% mental," and concluded, as a result, that Plaintiff's work should "be limited to simple, rote labor." (R. at 250.)   Moreover, Dr. Coffey predicated his recommendation that Plaintiff's employment be limited to "simple" tasks upon Plaintiff's IQ test and interpersonal relatedness, not upon any professed physical, or obesity-related, conditions. (Id.; see also R. at 258-61 (setting forth Dr. Purcell's discussion of Plaintiff's limited intellectual and academic skills, without reference to any physical limitations or any notation of a readily apparent physical ailment).)   To the contrary, although Dr. Coffey recognized that Plaintiff's body mass index fell within the obese range, Dr. Coffey noted Plaintiff's "normal" gait, posture, and movements, in addition to Plaintiff's ability to "run around the block with a bike, [and] work out," among other physical activities. (R. at 248-

---

such conclusion. (Def.'s Br. at 10.) Moreover, even if the state consultant intended to conclude that Plaintiff's obesity precluded him from work beyond a light level of exertion, the Court finds the ALJ's contrary conclusion consistent with the weight of record evidence, particularly Plaintiff's own statements concerning his ability, both personally and professionally, to engage in a wide array of exertional activities. (See, e.g., R. at 199-201 (Plaintiff describing his ability to engage in significant household chores), 209-15 (Plaintiff describing his prior work history as having included long periods of walking and/or standing, a requirement that he "[h]andle, grab or grasp big objects," and lift/move items (including, parts, tires, and batteries) with weights between 10 and 50 pounds).)

49.)  For all of these reasons, the Court finds that substantial record evidence supports the ALJ's conclusion that Plaintiff's obesity did not constitute a severe impairment, and therefore turns to Plaintiff's alleged emotional impairment.

However, the Court need not belabor Plaintiff's position concerning an "emotional disorder" separate from Plaintiff's intellectual disability, because the record contains no reference to any emotional disorder. (Pl.'s Br. at 13.) Rather, the record reflects that Plaintiff never received or sought any psychiatric treatment, and he expressed independence in self-care, and an ability to interact socially. (See R. at 201.) Moreover, the various evaluative examiners all consistently concluded that Plaintiff's conduct lacked any indication of an emotional condition.  Dr. Coffey, for example, expressly stated that Plaintiff exhibited "no evidence of obsessions or compulsions," an abnormal mood, and/or any "suicidal or homicidal thinking." (R. at 249.) The state agency psychological consultants similarly concluded that Plaintiff has no "psychiatric or mental impairments," other than his limited cognitive functioning. (See, e.g., R. at 57.) Moreover, although Dr. Purcell noted some level of emotional fragility (see R. at 260 ("he presents as a need may emotionally and academically"), Dr. Purcell specifically concluded that his emotional issues resulted from his embarrassment concerning his limited

23

intellectual and academic skills, not as a result of any separate and distinct impairment. (Id.) Indeed, Dr. Purcell specifically explained her emotional observations as follows,

> [Plaintiff] stated that all academics were difficult for him and he was a "little rusty" concerning his academics. However, he did attempt all tasks given to him and actually wanted to perform well. He was very self-conscious concerning his academic limitations. He has experienced much negativism surrounding his academics and now as an adult finds himself in a difficult situation at his age to be unemployed and seeking new employment.

(R. at 254.) Consequently, any emotional issue related, inextricably, to Plaintiff's intellectual challenges, and the Court cannot find any record evidence—nor has Plaintiff proffered any—that the purported emotional issues qualifies as a severe impairment.[9]  For all of these reasons, the Court finds that substantial record evidence supports the ALJ's determination that Plaintiff only suffered from one severe impairment: intellectual disability.[10] (R. at 17.)  The Court

---

[9] Nor can the Court find any error in the ALJ's failure to discuss Plaintiff's alleged emotional issues at step two, in light of the fact that Plaintiff did not allege such impairment, nor does the existence of such purportedly separate condition find support in the record.

[10] However, even if the ALJ erred in finding Plaintiff's obesity and alleged emotional limitations non-severe, any error would be harmless, because the ALJ found in favor of Plaintiff at step two on the basis of his intellectual disability, and ultimately considered the effect of the non-severe impairments in assessing Plaintiff's residual functional capacity. See Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 n.2 (3d Cir. 2007) ("[E]ven if [an ALJ] had erroneously concluded that some of [a claimant's] other impairments were not severe, any error was

next addresses Plaintiff's argument concerning the ALJ's conclusion at step three.

### 2. The ALJ Did Not Err in Finding that Plaintiff's Condition Did Not Meet or Equal Listing 12.05C

At step three, the ALJ concluded that Plaintiff's intellectual impairment failed to meet or equal section 12.05 of the Listing of Impairments, because the "objective evidence in the record" did not support any severe impairment other than intellectual disability, nor indicate that Plaintiff's intellectual impairment resulted in a marked restriction to

---

harmless."); see also Golubosky v. Comm'r of Soc. Sec., No. 13-196, 2014 WL 3943029, at *5 (W.D. Pa. Aug. 12, 2014) (finding any error at step two harmless, because the ALJ proceeded with the sequential analysis and considered the limitations caused by the non-severe condition throughout the remaining evaluation). Critically, "even if an ALJ erroneously determines at step two that one impairment is not 'severe,' the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five." McClease v. Comm'r of Soc. Sec., No. 08-1673, 2009 WL 3497775, at *10 (E.D. Pa. Oct. 28, 2009) (citation omitted). Here, the ALJ found in favor of Plaintiff at step two, albeit only on the basis of Plaintiff's intellectual disability, and therefore continued the sequential evaluation process. (R. at 17-18.) Moreover, the ALJ specifically noted that Plaintiff's obesity "may have an adverse impact upon co-existing impairments" and, throughout the remainder of the analysis, the ALJ accounted for Plaintiff's potential exertional and emotional limitations. (See, e.g., R. at 19-20 (considering the presence, if any, of exertional limitations at step four), 21-22 (considering at step four, Dr. Purcell's observation that Plaintiff presents as emotionally and academically "needy").) Consequently, though the Court finds no error, even if it did, any error would be harmless.

Plaintiff's daily living, social functioning, concentration, persistence, and pace. (R. at 17-18.)

Plaintiff argues that the ALJ "rightly considered the [section] 12.05 listing," but improperly evaluated one of its subparts, section 12.05C, by failing to adequately consider evidence related to Plaintiff's ability to engage in "only occasional social contacts." (Pl.'s Br. at 14-15.)  Defendant counters, however, that Plaintiff's "social-contact limitation" constitutes "merely a symptom or manifestation" of Plaintiff's intellectual disability, and therefore fails to satisfy section 12.05C's requirement of an "additional and significant work-related limitation of function." (Def.'s Opp'n at 13-14.)  For the reasons that follow, the Court finds that substantial evidence supports the ALJ's step three determination.

As relevant here, Listing 12.05 provides, in relevant part, that

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

(Id.) In order to meet or equal the Listing, however, the plaintiff must meet both the introductory criteria, requiring "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested [before

26

age 22]," and, as relevant here, the criteria of subpart C.  See Gist v. Barnhart, 67 F. App'x. 78, 81 (3d Cir. 2003) ("[a]s is true in regard to any 12.05 listing, before demonstrating the specific requirements of Listing 12.05C, a claimant must show proof of a 'deficit in adaptive functioning' with an initial onset prior to age 22."); Cortes v. Comm'r of Soc. Sec., 255 F. App'x. 646, 651 (3d Cir. 2007) (same).

Subpart 12.05C, in turns, requires the plaintiff to demonstrate a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, app.1 (emphases added).  Therefore, Plaintiff must establish "another impairment, in addition to the [intellectual disability], that imposes an additional and significant work-related limitation of function." Williams v. Sullivan, 970 F.2d 1178, 1184 (3d Cir. 1992).

The ALJ in this instance found subpart C inapplicable because Plaintiff suffers from no additional "severe impairment under the Social Security Act." (R. at 18.) Plaintiff challenges the ALJ's determination, and argues that his purportedly limited "social interaction" and related requirement of "regular supervision," constitute an "additional and significant work-related limitations not strictly arising out of the intellectual

27

disability," thereby satisfying the requirements of subpart 12.05C. (Pl.'s Br. at 15.)

The Court, however, rejects Plaintiff's attempt to divorce Plaintiff's alleged social limitations from his intellectual disability. (See generally Pl.'s Br. at 12-15.) Despite Plaintiff's position, the record amply reflects that any social limitations (to the extent minimally supported by record evidence) constitute merely a symptom or manifestation of Plaintiff's intellectual disability, rather than an independent impairment.  In that regard, the Court notes that, it is undisputed that Plaintiff never sought any psychiatric treatment, nor complained of any specific limitations in his ability to interact with others. (See, e.g., R. at 56, 65, 249 (all noting that Plaintiff "denied a psychiatric history").) To the contrary, Plaintiff stated that he socializes weekly with friends and family, attends church on Sundays, and has no problems getting along with others. (See R. at 201.) Moreover, Plaintiff specifically stated that "he prefers to work with others, utilizing physical energy, in a casual environment." (R. at 258.) The record therefore lacks any significant suggestion that Plaintiff possessed a significant, albeit undiagnosed, limitation in social interaction.

Indeed, in arguing that the ALJ failed to conduct "a proper evaluation of all [] Plaintiff's limitations," Plaintiff solely

relies upon Dr. Coffey's observation that Plaintiff has

"limited" social interaction, and Dr. Purcell's statement that

Plaintiff presents as emotionally fragile. (Pl.'s Br. at 14-15.)

Such statements, however, do not suggest that Plaintiff suffers

from a social-contact limitation separate from his intellectual

disability.  Rather, Dr. Coffey appears to have noted

Plaintiff's "limited" social interaction as a matter of fact,

given his observation that Plaintiff spends a "typical day" at

home, and only interacts with friends "2-3 times per month," and

not as part of Dr. Coffey's diagnosis. (R. at 248, 250.)

Moreover, Dr. Coffey did not find Plaintiff unable or limited in

his actual ability to engage in social interactions or to

maintain socially appropriate behavior. (See R. at 249.)  Nor

did Dr. Coffey state that Plaintiff would require "regular

supervision" as a result of any limited social skills. (R. at

250.)  Rather, Dr. Coffey indicated that supervision would be

necessary, in light of Plaintiff's extremely low ability to

process and comprehend complex instruction and processes. (Id.)

In addition, although Dr. Purcell commented that Plaintiff

appeared emotional fragile and required constant encouragement

during the intellectual assessment, she specifically noted that

such attributes arose from Plaintiff's frustration and

embarrassment with his limited intellectual and academic

abilities, not due to any limitation unconnected to Plaintiff's

intellectual disability. (See R. at 254-55, 258-61 ("It was obvious that [Plaintiff] was very embarrassed concerning his lack of academic mastery.").) Dr. Purcell, accordingly, concluded that any occupational placement must account for Plaintiff's limited academic functioning and, in particular, his inability to process complex information and/or instructions. (R. at 261.)

For all of these reasons, the Court finds that Plaintiff failed to establish that his social limitations constitute another impairment, in addition to his intellectual disability. See Williams, 970 F.2d 1184.  Rather, the record evidence reflects that Plaintiff's social-contact limitation—to the extent it exists—constitutes a symptom or manifestation of Plaintiff's intellectual disability and not, as required by subpart 12.05C, an additional impairment. See Hartzog v. Barnhart, 189 F. App'x 98, 100 (3d Cir. 2006) (finding that the plaintiff failed to satisfy 12.05C because the plaintiff's illiteracy appeared "to be a symptom or manifestation of his [intellectual disability], not an additional impairment") (citing Bucker v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (finding learning disability and difficulty concentrating and reasoning to be merely symptoms or manifestations of the plaintiff's intellectual disability, rather than an additional impairment)). Moreover, even if the Court found record evidence

30

to suggest that Plaintiff's alleged social-contact limitations presented an additional impairment, the record contains no evidence—nor has Plaintiff pointed to any—that such limitation significantly and adversely affected Plaintiff's work-related functioning. See Trego v. Astrue, No. 07-002, 2008 WL 638078, at *3 (M.D. Pa. Feb. 29, 2008) (recommending affirmance of the ALJ's decision, where substantial evidence did not suggest that plaintiff's hernia constituted an impairment that imposes "'an additional and significant work-related limitation of function'"), rejected on other grounds, 2008 WL 638081 (M.D. Pa. Feb. 29, 2008).

For all of these reasons, the Court finds that substantial record evidence supports the ALJ's step three determination that Plaintiff failed to establish the existence of any other impairment that imposed an additional and significant work-related functional limitation, and that Plaintiff therefore failed to satisfy the criteria of subpart C.  The Court next considers Plaintiff's arguments concerning the ALJ's residual functional capacity assessment.

### 3. The ALJ Properly Relied Upon the Medical-Vocational Guidelines and SSR 85-15 in Finding Plaintiff Able to Perform "Other Work"

Because the ALJ concluded that Plaintiff lacked the residual function capacity to perform his past relevant work, the ALJ proceeded to step five. (R. at 26.)  In step five, the

ALJ considered whether Plaintiff possessed the capability to perform other work existing in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work experience. See 20 C.F.R. § 1520(g); 20 C.F.R. 404.1560(c).  The ALJ then evaluated the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2, and noted that, because Plaintiff possessed the residual functional capacity to perform work at all exertional levels, the Guidelines might have directed a finding of "not disabled." (R. at 26-27.)  The ALJ found, however, "[s]trict application" of the Guidelines "not possible," because Plaintiff's mental, or nonexertional, limitations necessarily narrowed his range of work. (R. at 26.) The ALJ, accordingly, relied upon SSR 85-15, in finding, without the benefit of a vocational expert, that Plaintiff's intellectual disability did not preclude him from meeting the basic mental demands of unskilled labor, including an ability to understand, to carry out or remember simple instructions, and to function within a work-like setting. (R. at 27.)  For the reasons that follow, the Court finds the ALJ's reliance appropriate.

In order to determine whether jobs exists in the national economy for a particular plaintiff, the Court of Appeals generally requires that an ALJ support his determination by

citing to rules, relying on vocational testimony, or by taking judicial notice of certain vocational resources. See Sykes v. Apfel, 228 F.3d 259, 273 (3d Cir. 2000); Hall v. Comm'r of Soc. Sec., 218 F. App'x. 212, 217 (3d Cir. 2007).  When a claimant exhibits "only exertional (i.e. strength) impairments," the ALJ may properly rely in step five solely upon the grids.  Nieves v. Comm'r of Soc. Sec., No. 12-5590, 2013 WL 3811645, at *4 (D.N.J. July 22, 2013) (citing Sykes, 228 F.3d at 269) (emphasis added). Where, however, the claimant exhibits nonexertional limitations, as here, the ALJ cannot simply rely on the medical-vocational guidelines to direct a finding of not disabled at step five. See Hall, 218 F. App'x at 215.  Rather, the ALJ generally must take the testimony of a vocational expert or rely upon similar evidence in determining the manner in which the claimant's nonexertional impairments affect his residual functional capacity. See Sykes, 228 F.3d at 273.

In the alternative, an ALJ may rely upon an SSR, provided that "'it is crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base.'" Burrows v. Comm'r of Soc. Sec., 2014 WL 2919469, at *4 (D.N.J. June 27, 2014) (quoting Allen v. Barnhart, 417 F.3d 396, 406 (3d Cir. 2005)). Under such circumstances, an ALJ need not resort to a vocational expert, and may instead rely upon an SSR, so long as the "ALJ's

33

own reference to the SSR ruling discuss[es] specifically the limitations presented by the medical record." Allen, 417 F.3d at 407; see also See Meyler v. Commissioner of Social Security, 238 F. App'x 884, 890-91 (3d Cir. 2007) (vacating and remanding for further explanation by the ALJ concerning how the plaintiff's specific limitations affected "her ability to perform unskilled work in a job that constitutes substantial gainful employment" and "relate[d] to the categories or examples in SSR 85-15").

Here, the parties do not dispute the existence of nonexertional limitations. (See Pl.'s Br. at 17; Def.'s Opp'n at 15.)  Rather, Plaintiff solely argues that the ALJ's erred in relying upon SSR 85-15, without seeking testimony from a vocational expert.[11] (See Pl.'s Br. at 14-17.)

---

[11] In addition, "if the ALJ plans to rely on an SSR rather than make an individualized determination based on the testimony of a vocational expert," the ALJ must generally provide notice to the claimant of his intention.  Fullaway v. Astrue, No. 06-5771, 2008 WL 877968, at *7 (citing Allen, 417 F.3d at 407).  The record in this action leaves some doubt concerning whether the ALJ provided notice of his intention to rely upon SSR 85-15, but because Plaintiff does not challenge the ALJ's determination on this ground, the Court need not reach this issue. (See Pl.'s Br. at 15-18 (only arguing that the ALJ erred by failing to call a vocational expert).) Nevertheless, the Court notes that the Court of Appeals does not require advanced noticed in every instance, nor does the failure to provide such notice automatically require reversal. See Smalls v. Comm'r of Soc. Sec., No. 09-2048, 2010 WL 2925102, at *9 (D.N.J. July 19, 2010) ("The Court ... finds that, under Allen, advanced notice is not unequivocally required in every circumstance."). Rather, in the absence of advanced notice, courts must subject the ALJ's reliance upon a Social Security ruling to "close scrutiny." Allen, 417 F.3d at 408. Having closely scrutinized the ALJ's

SSR 85-15 provides in relevant part that,

> Where a person's only impairment is mental, is not of
> listing severity, but does prevent the person from
> meeting the mental demands of past relevant work and
> prevents the transferability of acquired work skills,
> the final consideration is whether the person can be
> expected to perform unskilled work. The basic mental
> demands of competitive, remunerative, unskilled work
> include the abilities (on a sustained basis) to
> understand, carry out, and remember simple
> instructions; to respond appropriately to supervision,
> coworkers, and usual work situations; and to deal with
> changes in a routine work setting. A substantial loss
> of ability to meet any of these basic work-related
> activities would severely limit the potential
> occupational base.

SSR 85-15, 1985 WL 56857, at *4. SSR 85-15 further "states that

depending upon the nature and extent of the impairment, an ALJ

may need to consult a vocational resource, or for 'relatively

simple issues,' the publications in sections 404.1566 and

416.966." Burrow, 2014 WL 2919469, at *5 (quoting SSR 85-15,

1985 WL 56857, at *3). In more complex cases, by contrast, SSR

85-15 directs that "a person or persons with specialized

knowledge," namely, vocational experts, "would be helpful." SSR

85-15, 1985 WL 56857, at *3.

Here, Plaintiff insists that the ALJ's finding that

Plaintiff's intellectual disability limited Plaintiff's to work

involving only simple, repetitive tasks, simple instructions,

and occasional interaction with others, "drastically

---

decision, the Court finds that the ALJ conducted the requisite
legal analysis at step five.

35

restrict[ed] the numbers and types of jobs [that] any individual could perform." (Pl.'s Br. at 17.)  Moreover, given Plaintiff's position concerning Plaintiff' social-contact limitations, counsel for Plaintiff argues that he could hardly imagine a job that an individual could perform "away from the public or co-workers," or that would "not require at least some contact with a supervisor at the time and place of the supervisor's choosing." (Id.)  Plaintiff therefore insists that the complexity of Plaintiff's impairment exceeded the ALJ's abilities to independently assess Plaintiff's potential work limitations, and required vocational testimony.  (Id.)

The Court, however, finds the ALJ's reliance upon SSR 85-15 as an alternative to a vocational expert appropriate, in light of the "relatively simply issues" presented by the nature and extent of Plaintiff's intellectual disability, and because the record evidence demonstrated that Plaintiff's limitations did not result in a substantial inability to meet the basic mental demands of unskilled work.  In that regard, the Court finds Burrows v. Commissioner of Social Security, No. 13-3744, 2014 WL 2919469 (D.N.J. June 27, 2014), instructive.

In Burrows, the ALJ found that the plaintiff suffered from severe impairments consisting of opiate dependence, and an anxiety and depressive disorder.  Id. at *3.  As a result, the ALF found at step four that the plaintiff suffered, as here,

36

from only nonexertional limitations, including "a mild restriction in her activities of daily living, a moderate difficulty in social functioning, and moderate difficulties with regards to concentration, persistence, or pace." Id. at *4.  At step five, the ALJ further determined that the plaintiff could not return to her past relevant work as a waitress, because her impairments limited her "to unskilled work with short, simple instructions, routine tasks, and only occasional contact with the public, supervisors, and co-workers." Id.  Based upon the Guidelines, however, the ALJ concluded, through specific reference to SSR 85-15, that the plaintiff could perform alternative jobs in the national economy, and was therefore not disabled, nor entitled to Social Security benefits.  Id.

On appeal, counsel for the plaintiff identically argued, as here,[12] that the nature of the plaintiff's nonexertional limitations required vocational testimony, because the plaintiff's "impairments resulted in her limitation to work involving only short, simple instructions, routine tasks, and occasional interaction with others, [and] drastically restricted the numbers and types of jobs any individual could perform." Id. at *5.  The Burrows court, however, found that "the nature and

---

[12] As noted by Defendant, Mr. Polonsky, counsel for Plaintiff, represented the Burrows plaintiff.  (See Def.'s Opp'n at 17 (noting parenthetically that Mr. Polonsky represented the Burrows plaintiff).)

37

extent of [the] plaintiff's nonexertional limitations did not

require" a vocational expert, because she retained the ability

"to go to a Methadone clinic daily, to receive therapy 1 to 2

hours once a week, clean her house, garden, do laundry, prepare

meals, to read 2 to 3 hours per day, arrange for transportation,

and [to] maintain relationships with her husband, daughter and

grandson."  Id.  The court further rejected the plaintiff's

"hypothetical that there are not jobs in which any person would

not be required to interact with a supervisor," because the ALJ

found plaintiff "limited to occasional contact with others," not

"that she could have no contact with others."  Id.  The court,

accordingly, found the case lacked the complexity necessary to

require testimony from a vocational expert, and found the ALJ's

reliance upon the Guidelines and SSR 85-15 "allowable."  The

Court finds the facts of Burrows particular analogous to this

action, and follows its rationale.

Critically, although Plaintiff finds the ALJ in no position

to assess how Plaintiff's limitation would affect his work

absent vocational testimony, Plaintiff ignores the ALJ's

extensive citation to the record evidence demonstrating

Plaintiff's ability "to understand, carry out or remember simple

instructions," in addition to his ability to "respond

appropriately to peers or authorities and [to] function within a

routine work-like setting." (R. at 27.)  Indeed, the record, all

of which the ALJ incorporated into his decision, is replete with references to Plaintiff's ability to meet all of the basic mental demands of unskilled work.  (See, e.g., R. at 58, 72 (setting forth the state agency psychological consultants' conclusions that Plaintiff had no significant limitation in his ability to understand and remember simple instructions), 201-02 (setting forth Plaintiff's only statements that he had no problem getting along with others, nor understanding), 250 (setting forth Dr. Coffey's determination that Plaintiff possessed "adequate understanding" and an ability to maintain regular employment "limited to simple, rote labor"), 259-61 (setting forth Dr. Purcell's consistent conclusions that Plaintiff possessed the ability to process simple instructions, provided he received appropriate repetition).)  Given the weight of this consistent evidence, the ALJ found it "reasonable" to conclude that jobs existed in significant numbers that Plaintiff could perform "on a regular, sustained, reliable and competitive basis." (R. at 28.)  And, despite Plaintiff's contention to the contrary, the Court finds that Plaintiff's nonexertional limitations squarely comport with the manner in which SSR 85-15 states that such nonexertional limitations impact Plaintiff's occupational base.  Indeed, SSR 85-15 specifically states that an individual has skills sufficient to meet the basic mental demands of unskilled work where the individual "can understand,

carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; [and/or] deal with changes in a routine work setting," SSR 85-15, 1985 WL 56857, at *4, and, as stated above, the record clearly discloses Plaintiff's ability to meet such demands.

Given the consistency between the record evidence in this instance and SSR 85-15's directives, the ALJ reasonably concluded that Plaintiff did not suffer from a substantial loss of ability to meet any of the basic work-related activities. (R. at 26-28.)  To that end, the Court does not find that this action rises to a level of complexity that necessitates a vocational expert.  See Burrows, 2014 WL 2919469, at *6. Consequently, the Court finds the ALJ's reliance upon the Guidelines and SSR 85-15 appropriate, particularly given the ALJ's specific discussion of Plaintiff's limitations.[13]  See

---

[13] Nor does the Court find that Allen v. Barnhart, 417 F.3d 396 (3d Cir. 2005) or Poulos v. Comm'r of Soc. Sec., 474 F.3d 88 (3d Cir.2007) compel any contrary result.  (See Pl.'s Br. at 17-18 (relying upon Allen and Poulos).)  To the contrary, the agrees with the Burrows court that both cases concern factually distinct scenarios, particularly because the Court of Appeals only remanded both actions in light of the ALJs' failures to make sufficient and specific findings concerning the impact of the plaintiffs' limitations on their ability to work.  See Allen, 417 F.3d at 405-07; Poulos, 474 F.3d at 94.  Here, by contrast, the ALJ made specific findings concerning the manner in which Plaintiff's non-exertional limitations impact—or fail to impact—his ability to meet the basic mental demands of unskilled work.  (See R. at 26-27.)

Padilla v. Astrue, 2011 WL 6303248, at *12 (D.N.J. Dec. 15,
2011) (finding that "the ALJ's reliance on SSR 85-15 as an
alternative to calling a vocational expert satisfied the
requirements set forth in Allen v. Barnhart, 417 F.3d 396 (3d
Cir. 2005).

**V.   CONCLUSION**

For all of these reasons, the Court finds that substantial
evidence supports the ALJ's determination that Plaintiff did not
have a qualifying disability under the Social Security Act.   The
Court, accordingly, affirms the ALJ's decision.   An accompanying
Order will be entered.


**March 6, 2015**                                   **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            Chief U.S. District Judge